**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


**JULIAN ROBINSON**                                       **CIVIL ACTION**

**VERSUS**                                                       **NO: 05-6319**

**BURL CAIN, WARDEN**                                 **SECTION: "K"(2)**


<u>**ORDER AND REASONS**</u>


Before the Court is the Objections to Report and Recommendations (Rec.Doc.No. 16)

("Objections") filed by Petitioner Julian Robinson, wherein he contends that the Magistrate

Judge incorrectly recommends dismissal. After reviewing the pleadings, memoranda, state court

record, Report and Recommendation (Rec.Doc.No. 15) ("Report") of the Magistrate Judge and

Objections thereto, and holding an evidentiary hearing on July 30, 2007, the Court hereby grants

Julian Robinson's habeas corpus petition for the reasons assigned below.[1]

---

[1]     Because the Court finds Petitioner has successfully asserted a *Brady* claim, the
Court need not address Petitioner's ineffective assistance of counsel claim.

1

# I. BACKGROUND

**A.      Facts and State Court Proceedings**

Julian Robinson was indicted on June 12, 1997, by an Orleans Parish grand jury for the second degree murder of Charles Lewis, on a theory of aiding and abetting.[2]  DeShawn Rose, the alleged gunman, was also indicted in the murder,[3] but the cases were severed.[4] Robinson went to trial first, in February of 1999.[5]

The Louisiana Fourth Circuit Court of Appeal summarized the trial testimony as follows:

> New Orleans Police Officer Michael Buras testified that at approximately 11:30 p.m. on March 23, 1997, he conducted an investigation of a homicide, which occurred in the Calliope Housing Development. Officer Buras found the victim lying on his right side with a small piece of yellow paper inserted in his nose. The name "Antoine" and a cell phone number was (sic) written on the paper. The victim was blindfolded and shot when found. Next to the victim's body, Officer Buras found a syringe, several .45-caliber casings and six live rounds of rifle ammunition, the type used by an AK 47 assault weapon. He spoke to Dionne Lewis, the victim's sister[;] Janice Knight, a witness [;] and a confidential informant. In the course of his investigation, Officer Buras developed the names of three suspects– Deshawn Rose, Julian Robinson and Antoine Quinn. Janice Knight gave a statement to Officer Buras and picked Deshawn Rose out of a picture lineup as one of the perpetrators. As a result of his conversations, with Janice Knight, Officer Buras obtained arrest warrants for Julian Robinson and Deshawn Rose...

---

[2]      Rec. Doc. No.3, Petition.

[3]      St. Rec. Vol. 1 of 4, p.1.

[4]      *Id.* at 10.

[5]      *Id.* at 11.

Officer Byron Winbush, a firearms expert, testified that the .45 caliber bullets were recovered, two from the victim and two from the murder scene. All four bullets were fired from the same weapon. He also examined five .45 cartridge cases and determined that the five casings were fired from the same gun. However, he could not say that the bullets and casings were fired from the same weapon. Additionally, six live rounds of AK-47 ammunition were found at the scene. The murder weapon was never found...

At trial the jury listened to Robinson's audio taped statement while reading the transcription of the statement. In the statement, Robinson said he and the victim were good friends and were together on the night of the murder looking for drugs. They were walking toward a driveway in the housing development, when the victim told him to wait there, that he (victim) was going to get money from "Deshawn" to buy drugs. At that point, a white car with two men in it stopped and picked up the victim and then drove down the driveway out of Robinson's sight. A short while later, the car returned to the area where he was sitting and stopped to let the victim get out. As the victim exited the car, the men in the car shot him. At that point Robinson said he ran. He denied killing the victim and said that he did not know the men in the car. Three days later, Robinson spoke to the victim's girlfriend about the murder.

      Janice Knight testified on behalf of the State. She said that she, her three grandchildren and her grandmother were residents of the housing development on the night of the murder. At around 11:30 p.m. that night, she left her apartment to walk to a nearby store to buy cigarettes. As she walked through the courtyard area, she noticed four men standing in a circle around another man who was kneeling. As she got closer she could see that three of the men standing were armed with handguns and the fourth man, "Julius," had a large "rifle-like gun" at his side. She heard Julius ask the man kneeling, "Where's my shit?" The man kneeling responded that he did not know what Julius was talking about. After she passed the men, she heard five or six gun shots. She hurriedly left the area and did not return to her home for a day or so because she was afraid the killer(s) saw her. She did not go to the police for a couple of days because she was scared. She recognized "Julius" from the neighborhood.

State Record Volume 4 of 4, pp. 525-27 (Fourth Circuit Opinion, 99-KA02215, pp. 1-3, January 12, 2000); *State v. Robinson*, 761 So.2d 820 (La. App. 4th Cir. 2000) (unpub.)(Table).

    Before Robinson's trial, his counsel had been presented with a daily police report from

April 4, 1997, which stated that Ms. Knight had identified him, Deshawn Rose and Antoine

Quinn by name.[6] The report also stated that Ms. Knight recalled that Rose, and not Robinson,

was the one holding a large gun.[7] She had further stated that the other men kept their handguns

not in their hands but rather tucked into their pants.[8]

In May of 1999, Rose was acquitted of murder charges in a trial by jury.[9] During this

trial, the following information came to light through defense counsel's cross-examination of

Detective Buras: (1) contrary to that April 4, 1997, daily report written by Det. Buras, Ms.

Knight did not identify Deshawn Rose, Antoine Quinn and Julian Robinson by name; (2) Det.

Buras learned of those names before interviewing Ms. Knight; and (3) Det. Buras incorrectly

attributed those identifications to Ms. Knight, the only eyewitness.[10]

Some time after Robinson's conviction, Robinson's defense counsel obtained a copy of a

police report that stated, in part, the following information, which his counsel claims was

previously unknown to her:

> (1) On March 24, 1997, Mr. John Summers told police that, on the
> night of the murder, he heard, from his apartment, what sounded like
> a man and woman arguing, followed by several gunshots.[11]
>
> (2) Around that same date, another man, who wished not to be

---

[6] St. Rec. Vol. 4 of 4, Transcript of Motion for New Trial, p. 3; St. Rec, Vol. 2 of 4, at 202.

[7] St. Rec, Vol. 2 of 4 at 202.

[8] *Id.*

[9] St. Rec. Vol. 1 of 4 at 11.

[10] St. Rec. Vol. 2 of 4 at 203.

[11] St. Rec. Vol. 1 of 4 at 155.

named, told police that he had heard the victim Lewis was killed in retaliation for his breaking into and stealing money from Deshawn Rose's house.[12]

(3) The same man testified that on the night of the murder Lewis contacted Rose to ask if he (Rose) wanted to buy an AK-47 type rifle; that Rose advised Lewis to meet him (Rose) at S. Claiborne Ave. and Martin Luther King. Blvd for the transaction;[13] that Lewis met two subjects in a white station wagon at that intersection, and together they went to the 1200 block of S. Galvez St. (the crime scene), where victim retrieved the weapon; that after handing over the gun, the victim was shot with a .45 caliber handgun by the two subjects, who immediately fled the area in the station wagon; and that one of the two subjects was the victim of the previously mentioned robbery.[14]

(4) On March 24, 1997, Dionne Lewis, the victim's sister, told police that on March 20, 1997, the victim contacted her and stated that he was stopped on St. Ann St. by a man who demanded to know, "Why did you rob my house?"[15]

(5) On March 25, 1997, Ms. Lewis told police that she had been approached by a woman who told her that "Deshawn" and "Antoine" killed her brother and that they were driving a white station wagon. Ms. Lewis provided police with Antoine Quinn's name and address and "Deshawn's" address.[16]

(6) On April 1, 1997, Det. Buras was made aware that another officer had been in contact with a man who wished to remain anonymous and who identified Robinson as a witness to the crime.[17]

The state trial court held a subsequent hearing on Robinson's pending motion for new

---

[12]     *Id.*

[13]     *Id.*

[14]     *Id.* at 156.

[15]     *Id.* at 155.

[16]     *Id.* at 156.

[17]     *Id.* at 158.

trial and supplemental motions alleging violations of *Brady v. Maryland*, 373 U.S. 83, 87 (1963).[18] Robinson alleged (1) that Det. Buras's incorrect attribution of name identification to Ms. Knight in his April 4, 1997, daily report could have been used as exculpatory or impeaching evidence, had it been known by Robinson at the time of his trial, and (2) that the supplemental police report contained information that could have been exculpatory had it been known by Robinson at the time of the trial.[19]

In that hearing, the court found (1) that knowledge of the misattribution of name identification would not have materially affected the outcome of the trial[20] and (2) that the information in the supplemental police report was inadmissible hearsay evidence and would not have affected the outcome of the trial.[21] The Louisiana Fourth Circuit found the same on appeal.[22]  Robinson's subsequent application to the Louisiana Supreme Court was denied without reasons in 2004.[23]

---

[18]     St. Rec. Vol. 4 of 4, Transcript of Motion for New Trial at 1, 10.

[19]     *Id.*

[20]     *Id.* at 18.

[21]     *Id.* at 19, 21.

[22]     Rec. Doc. No.15 ("Report"). at 6.

[23]     *Id.* at 7.

**B.**      **Federal Habeas Petition and Magistrate's Report**

In his federal petition, Robinson similarly claims that, in violation of *Brady*, the State withheld evidence regarding implications raised by Officer Buras's April 4, 1997, report and withheld much of the supplemental homicide report.[24] Magistrate Judge Wilkinson addressed both of these issues in his Report and Recommendation and found Robinson's *Brady* claim meritless.[25]

In his analysis of the name identification issue, the Magistrate Judge observed that, because defense counsel had both Knight's statement to the police (in which she says she could only identify one man by name– "Julious") and Officer Buras's April 4th report, any inconsistencies between the two should have been apparent before trial.[26] In other words, both before and during the trial, counsel should have noted that Knight did not identify the three suspects by name.

In his analysis of the supplemental report issue, the Magistrate Judge relied on (1) the state trial court's determination that the information contained in the report was inadmissible hearsay, as well as, (2) *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995), which stated that polygraph results were not evidence because they were categorically inadmissible under state law and, therefore, were not *Brady* material.[27] The Judge also pointed out possible inconsistencies in trial

---

[24]      Rec. Doc. No. 3, at 15.

[25]      Report at 22, 25.

[26]      *Id.* at 23- 24.

[27]      *Id.* at 20.

counsel's testimony of what she did and did not have from this supplemental report before trial.[28]

Robinson now objects to the Magistrate Judge's findings on both issues. He specifically claims that such a finding ignores his fundamental right to present a defense that would exculpate him and impeach the State's witnesses.

## C.    Evidentiary Hearing

The Court held an evidentiary hearing on July 30, 2007, pursuant to 28 U.S.C. § 2254(d) to determine "the merits of [a] factual dispute [that] were not resolved in the State court hearing."[29] Moreover, the Court exercised its authority to inquire into any matters it sees fit and "receive[d] evidence bearing upon the applicant's constitutional claim[s]." *Townsend v. Sain*, 372 U.S. 293, 318 (1992).[30]

Specifically, the Court sought to determine to what extent, if at all, a certain supplemental police report containing information favorable to Petitioner was withheld from the defense prior to the state court trial that resulted in Petitioner's conviction.[31] The Court should inquire into the actions of the defense counsel in order to determine whether the state's withholding of evidence affected Petitioner's ability to put on a defense as well as whether such

---

[28]    *Id.* at 20-21.

[29]    28 U.S.C. § 2254(d)(1).

[30]    A presumption of correctness or clear and convincing standard does not apply because the state court made no factual finding as to whether the Supplemental Report was withheld from defense counsel prior to trial.

[31]    It is also alleged that an investigator doctored a report dated April 4th so as to credit identification of three suspects to a witness who had only identified one of the suspects.

evidence would bear upon Petitioner's ineffective assistance of counsel claim.

The Court ordered the appearance of the attorney Kara Williams, who represented Petitioner during the trial, and ordered the production of Ms. Williams's case file with respect to Petitioner. After review of the case file, it is apparent that it did not contain the supplemental police report at issue. Williams did admit, however, that she possessed the last page of the supplemental report which reflects a conversation between Petitioner and the victim's sister, Dionne Lewis. This portion reads as follows:

> On March 31, 1997, Detective Buras received a telephone call from Ms. Dionne Lewis, who stated on Saturday March 29, 1997, a male subject by the name of Julious last name unknown came to her at her residence located at 1220 South Galvez Street, and stated to her that he was sorry that her brother had been killed.
>
> Julious stated on the day of the murder he and the victim met in the 1200 block of South Galvez Street where the victim told Julious to stay here because the AK-47 is in the bushes and he had to go meet two guys that are going to buy the rifle.
>
> The victim returned with the two guys in a white vehicle. While the victim and the two guys were looking at the rifle the victim asked Julious to leave as he was making the two guys nervous. Julious at that time walked to the driveway where watched the transaction, when one of the subjects pulled a weapon and shot the victim several times and then fled in a white car. Ms. Lewis advised Detective Buras, that she is going to try to obtain the last name of Julious and his current address.[32]

With respect to portions of the Supplemental Report that Williams did not possess, the Magistrate's Report and Recommendations (Rec.Doc.No. 15) ("Report") suggests that the "trial counsel's testimony at the hearing on the motion for a new trial is internally inconsistent about

---

[32]     State. Rec. Vol I of IV at 163.

whether she in fact had the supplemental report."[33] The Magistrate Judge submits that Ms.

Williams had the last page of the report but admitted that she was "in a hearing where portions of

that same report had been redacted before production to her."[34] Moreover, the Magistrate Judge

suggests Ms. Williams testified that she recalled information relating to statements made by a

witness named Mr. Summers,[35,36] and "received a portion of the supplemental homicide report

regarding Ms. Lewis's conversation with Robinson about the AK-47 after her brother's death.[37]

The Magistrate Judge concluded that "it would seem that counsel may have had more of the

report before trial than she claimed to have had in her possession."[38]

---

[33]     Report at 20.

[34]     *Id.* at 21.

[35]     *Id.*

[36]     With respect to this inconsistent testimony about whether Ms. Williams had
knowledge of certain information contained in the Supplemental Report, the Magistrate's Report
reads as follows:

> In addition, Robinson's hearing counsel questioned her about the
> fourth paragraph of page nine of [the Supplemental Report], which
> was not the page she had in her file. The information related to
> statements made by a witness named Mr. Summers. She testified that
> she recalled knowing the information contained in that paragraph.
> She also stated that she recalled information from another portion of
> the report containing similar statements made by Ms. Lewis. The
> record indicates that counsel also received from the State prior to trial
> a portion of the supplemental homicide report regarding Ms. Lewis's
> conversation with Robinson about the AK-47 after her brother's
> death. Thus, it would seem that counsel may have had more of the
> report before trial than she claimed to have had in her possession.

Report at 21.

[37]     *Id.*

[38]     *Id.*

The analysis in the Report and Recommendation intimates Petitioner's trial counsel had more information than was contained in the last paragraph of the Supplemental Report. As the Report notes, Williams claims to have had only one page of the Supplemental Report consisting of the three paragraphs cited above. However, the Report's observation that "counsel also received from the State... a portion of the...report regarding Ms. Lewis's conversation with Robinson about the AK-47"[39] is merely referring to information that was contained in the three-paragraph page that was in trial counsel's file.[40] Thus, the Magistrate's suggestion that Ms. Williams may have received the supplemental report because of her knowledge of Ms. Lewis's conversation with Petitioner relating to the AK-47 is incorrect.

However, the Report's contention that Petitioner's trial counsel had information about Mr. Summers's statement does raise concerns as to whether Ms. Williams was in fact provided with the Supplemental Report.

The portion of Ms. Williams's testimony at the Motion for New Trial relating to Mr. Summers reads as follows:

> Q:    Were you provided with the information that detectives had interviewed [Mr. Summers] who around the time of the murder had heard a man and woman arguing and then gunshots?
>
> A:    I don't remember Mr. Summers' name. A lot of the portions of witnesses' statements were blackened out. I was told that – I think we may even have had a motion in limine on it and I was told that I was not being provided with the entire statement and the entire report. And the portions I got were blackened out to protect witnesses because witnesses had been threatened. And I do recall information about an

---

[39]    Rec. Doc. No.14, pp. 21-22.

[40]    State Rec., Vol. IV of IV, p. 10.

> argument between a man and a woman, but I think it was a
> portion of Miss Dion (sic) Lewis's statements, that she heard
> a man and woman arguing.[41]

Based on this testimony, the Magistrate Judge concluded that trial counsel recalled information ostensibly conveyed by Mr. Summers. However, it is clear in her answer that she attributes this information, albeit with some hesitation, to Dionne Lewis. After reviewing the case file, there is no indication that Dionne Lewis made any statements about a man and a woman arguing; however, in the traffic incident report the investigating officer does write down that Ms. Lewis indicated that she heard four or five gunshots on the night of the murder while she was watching television in her home.[42]

At the hearing for a new trial, Robinson's trial counsel suggested she may have been provided other parts of the report beyond the three-paragraph single page when she says: "I was told that I was not being provided with the entire statement and the entire report. And the portions I got were blackened out to protect witnesses because witnesses had been threatened."[43] Thus, it is unclear whether counsel had only the three-paragraph portion of the supplemental report or the entire report or portions thereof with many sections or names blackened out.

The trial judge ruled that the evidence alleged to be withheld simply was not material and would not have affected the outcome of the trial.[44]

These issues were clarified by Williams at the July 30, 2007, hearing held before this

---

[41]   State Rec. Vol IV, Tr. Mot. New Trial at 11

[42]   *See* Defense Attorney Case File on Julian Robinson (herein "Robinson defense file").

[43]   St. Rec. Vol. 4 of 4, Transcript of Motion for New Trial, p. 11.

[44]   *Id.* at 22.

Court. The Court finds Williams's testimony credible. It is abundantly clear that she was not provided with the Supplemental Report, until after the trial. Moreover, it was made clear that the last page provided to Williams was actually an excerpt from the withheld portion of the Supplemental Report.[45] In fact, left out of this except was the paragraph immediately following the excerpted portion, which stated, "Ms. Lewis further advised Detective Buras that on Saturday, March 29, 1997, she observed the white station wagon parked in the 2900 block of Freret Street and the license plate has been removed."[46] This is significant because it would be corroborative of Robinson's version of the facts. Moreover, its withholding explains why Williams filed a motion in limine to exclude the testimony of Lewis, as Williams testified at the evidentiary hearing that she had no information suggesting Lewis would have been a corroborative witness.[47,48] This selective excerpting of the Supplemental Report as it regards Lewis certainly raises the Court's suspicion that the Supplemental Report was withheld intentionally.[49]

Thus, the Court finds that Petitioner has shown that he was not provided with the

---

[45]     St. Rec. Vol. 1 of 4 at 157, 163 ("Supplemental Report"). The Supplemental Report is entitled "Homicide Investigation" and it was referred to in the pleadings as the Supplemental Report or Supplemental Homicide Report. For the purposes of clarity and consistency, the Court adopts this designation.

[46]     *Id.* at 157.

[47]     *See* Exhibit One (Attached Hereto).

[48]     Williams further testified that she had been instructed by the trial judge not to talk to any of the government witnesses prior to trial. She explained that this prompted her to file a motion in limine because she assumed that the testimony of the victim's sister and girlfriend would be damaging to her client.

[49]     Although a court need not find that material was withheld from the defense intentionally for the purposes of a *Brady* claim.

13

Supplemental Report prior to trial and the fact that Detective Buras manufactured the April 4th

Report was not known to Robinson until after trial.


## II. STANDARD OF REVIEW


Magistrate judges are empowered by statute to preside over certain pretrial matters upon

appointment by a district judge. 28 U.S.C. § 636(b)(1)(A); *see also* Rules Governing § 2254

Cases, Rule 10. A district court evaluating a magistrate judge's recommendation may adopt those

portions of the recommendation to which no specific objection is made, as long as those sections

are not clearly erroneous. *See id.;* FED.R.CIV.P. 72(b). However, where a party makes "specific,

written objections" within ten days after being served with a copy of the magistrate's

recommendations, the district court must undertake *de novo* review of those contested aspects of

the report. 28 U.S.C. § 636(b)(1)(c); *see also* FED.R.CIV.P. 72(b). The district judge may then

"accept, reject, or modify the recommended decision, receive further evidence, or recommit the

matter to the magistrate judge with instructions." FED.R.CIV.P. 72(b).

In reviewing Section 2254 petitions, the Court must apply the legal standards as set forth

in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA

comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254.

Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of

fact, questions of law, and mixed questions of law and fact. Provided that the state court

adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact

are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). *Hill v.*

*Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams*[ *v. Taylor*, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Hill*, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

### III. ANALYSIS

**I.**      ***Brady* claims**

The Supreme Court has held that Due Process is violated when material evidence favorable to the defendant is withheld from him. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To prove such a violation, a defendant must show that (1) the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching, (2) the evidence was withheld by the state, either willfully or inadvertently, and (3) prejudice ensued. *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

Within the third element lies a materiality requirement, elaborated by the Supreme Court in *Kyles v. Whitley*. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). However, the test is not whether the inclusion of withheld evidence would have resulted in a different verdict, but rather "whether in its absence he received a fair trial... resulting in a verdict worthy of confidence." *Graves v. Dretke*, 442 F.3d 334, 339-40 (5th Cir. 2006) (quoting *Kyles*, 514 U.S. at 115). Moreover, the defendant need not show that the withheld evidence outweighs the inculpatory evidence, only that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

The Fifth Circuit, in *Williams v. Whitley*, said, "Where the evidence would seriously undermine the testimony of a key witness on an essential issue or there is no strong

corroboration [of that testimony], the withheld evidence has been found to be material." *Williams v. Whitley*, 940 F.2d 132 (5th Cir. 1991).

In determining a *Brady* violation, materiality is evaluated by viewing the evidence collectively. *Kyles*, 514 U.S. at 436. "We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect for purposes of materiality separately ...." *Id.* at 437, n. 10.

Otherwise, the evidence must be undiscovered by the defense before trial and undiscoverable through reasonable diligence. *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994); *U.S. v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980).

Robinson contends that, before his trial, the State suppressed the following material evidence: (1) the false statement of Det. Buras attributing Janice Knight with the identification of three suspects including Petitioner in his April 4th daily report;[50] and (2) the Supplemental Report generated by Det. Buras which contained information about multiple anonymous statements to police that are inconsistent with the theory of guilt the prosecution presented at trial.[51]

---

[50]     Petition at 8.

[51]     *Id.* at 9.

### A.    False Statements in Detective Buras's April 4th Daily Report

First, to qualify as *Brady* material, evidence must be exculpatory or impeaching. *U.S. v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). The fact that Det. Buras inserted the suspects' names into the report himself and attributed them to Ms. Knight is favorable to Robinson because it tends to impeach the testimony of Buras and the general credibility of the investigation he conducted.

Second, in order to qualify as *Brady* material, evidence must be withheld, either willfully or inadvertently. *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)) Further, the evidence must be undiscovered by the defense before trial and undiscoverable through reasonable diligence. *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994); *U.S. v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980).

The incorrectness of the April 4th statement was "withheld" to the extent that Det. Buras never let on before the trial that the information contained therein was inaccurate. However, this daily report was clearly inconsistent with other statements available to the defense. In that sense, it was discoverable through due diligence.

The State submitted as evidence Ms. Knight's April 5th statement which stated that she knew only one of the subjects' names– "Julious."[52] Ms. Knight testified to the same at trial.[53] These statements are inconsistent with Det. Buras's April 4th report in which he states that

---

[52]    St. Rec. Vol. 2 of 4 at 228.

[53]    Transcript of Trial at 42.

Knight identified three of the subjects by name.[54] A diligent defendant would have investigated this inconsistency and questioned Det. Buras on the issue at trial. Robinson claims that this information was not available at trial because it only came to light at Rose's trial.[55] However, Rose's counsel, in successfully unearthing this information, was presumably armed with the very same information that Robinson's counsel had. Therefore, Robinson cannot be said to have been diligent in pursuing this information, and cannot be considered *Brady* evidence. Thus, the Court need not address the issue of materiality.

### B.    Prosecution's Withholding of the Supplemental Report

First, the Court must consider whether the evidence withheld was favorable to the Petitioner.[56] Information that a woman came forward to Dionne Lewis, the victim's sister, and told her that Quinn and Rose killed the victim is favorable to Robinson in that it tends to exculpate him. Further information (from the same woman) that corroborated Robinson's account of the murder similarly tends to exculpate him. Also, information from confidential sources about Rose's possible retributive motive for the murder is favorable to Robinson; it provides a motive for Rose's alleged actions that, because it is not easily imputable to Robinson, is inconsistent with the theory of complicity used to convict Robinson at trial.

Second, the Court must determine whether the withheld evidence that is favorable to the

---

[54]    St. Rec. Vol. 2 of 4 at 202.

[55]    Petition at 8.

[56]    The Court has already determined above that the Supplemental Report was not provided to the Petitioner prior to trial.

19

defense is material. Evidence is material "if there is a reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have been different."

*Kyles v. Whitley*, 514 U.S. 419, 433 (1995). However, the test is not whether the inclusion of

withheld evidence would have resulted in a different verdict, but rather "whether in its absence

he received a fair trial... resulting in a verdict worthy of confidence." *Graves v. Dretke*, 442 F.3d

334, 339-40 (quoting *Kyles*, 514 U.S. at 115). Moreover, the defendant need not show that the

withheld evidence outweighs the inculpatory evidence, only that "the favorable evidence could

reasonably be taken to put the whole case in such a different light as to undermine confidence in

the verdict." *Kyles*, 514 U.S. at 435.

The Fifth Circuit, in *Williams v. Whitley*, said, "Where the evidence would seriously

undermine the testimony of a key witness on an essential issue or there is no strong

corroboration [of that testimony], the withheld evidence has been found to be material."

*Williams v. Whitley*, 940 F.2d 132 (5th Cir. 1991).

The state trial court denied Robinson's motions for a new trial on the grounds that the

supplemental report was in part hearsay and was therefore inadmissible.[57] The Louisiana Fourth

Circuit found the same.[58] The Magistrate Judge cited these decisions and the Supreme Court's

ruling in *Wood v. Bartholomew* to support its conclusion that hearsay can never be *Brady*

material because it is inadmissible.[59]

In *Wood*, the Court held that polygraph results were not *Brady* evidence, not because they

---

[57]     St. Rec. Vol. 4 of 4, Transcript of Motion for New Trial at 18-21.

[58]     Report at 6.

[59]     *Id.* at 20.

were inadmissible under state law but rather because they were not evidence under state law. *Wood*, 516 U.S. 1, 6 (1995). As such, the Court points out that, under state law, the results could not be mentioned during argument or during the questioning of witnesses. This decision reversed the ruling of the Ninth Circuit, who recognized the inadmissibility, but still reasoned that "the information, had it been disclosed to the defense, might have led respondent's counsel to conduct additional discovery that might have led to some additional evidence that could have been utilized." *Id.* at 6. The Supreme Court, instead of summarily rejecting this idea in favor of the hard-line rule that the Report suggests is controlling, took time in its analysis to rebut the lower court's reasoning on the issue.

The Court found that the Ninth Circuit's assertion that the polygraph results qualified as *Brady* material was unfounded because (1) the defendant's trial counsel had admitted that the withheld polygraph results would not have affected his cross-examination strategy and (2) the information could not possibly have materially affected the jury's finding of guilt. Overall, the Court, in dicta, chided the Ninth Circuit's reasoning for resting on "mere speculation, in violation of the standards we have established." *Id.*

The Supreme Court's analysis shows a willingness to entertain that inadmissible materials, even if not evidence, may be shown useful to a defendant in a way that makes the it material for the purposes of possible *Brady* violations. Some circuits have rejected this suggestion and have applied a hard-line rule that inadmissible evidence is immaterial as a matter of law. This restrictive interpretation of *Wood* is followed by the First and Fourth Circuits. Gregory S. Seador, *A Search for the Truth or a Game of Strategy? The Circuit Split Over the Prosecution's Obligation to Disclose Inadmissible Exculpatory Information to the Accused*. 51

21

Syracuse L. Rev. 139, 150 (2001).

The Magistrate Judge's adoption of this interpretation is contrary to case law in the Fifth

Circuit. In *Felder v. Johnson*, the Court said: "The Fifth Circuit has not clearly specified how to

deal with *Brady* claims about inadmissible evidence– a matter of some confusion in federal

courts– except to reaffirm that "inadmissible evidence may be material under *Brady*." *Felder v.*

*Johnson*, 180 F.3d 206, 212 (citing *Spence v. Johnson*, 80 F.3d 989, 1005 n. 14 (5th Cir. 1996)).

In *Sellers v. Estelle*, the Court said:

> In addressing the issue of materiality, the Magistrate found that
> Cantera's oral statements and Valenzuela's written statement would
> have been inadmissible, hence these reports were immaterial... Such
> a conclusion is unwarranted. First, by enabling the defense to
> examine these reports, Sellers may have been able to produce
> witnesses whose testimony or written statements may have been
> admissible... Second, the evidence here suppressed was material to
> the ***preparation of petitioner's defense***, regardless of whether it was
> intended to be admitted into evidence or not.

*Sellers v. Estelle*, 651 F.2d 1074, 1077 n.6 (5th Cir. 1981) (citing *Martinez v. Wainwright,* 621

F.2d 184 (5th Cir. 1980)) (emphasis added).

Therefore, the inadmissibility of evidence under state law is not dispositive on the issue

of materiality, and, according to *Felder*, the general question becomes "whether the disclosure of

the evidence would have created a reasonable probability that the result of the proceeding would

have been different," *Felder*, 180 F.3d at 212 (citing *East v. Johnson*, 123 F.3d 235, 237 (5th Cir.

1997)) and, more specifically, does the evidence "put the whole case in a different light as to

undermine confidence in the verdict." *Id.* at 213 (citing *Kyles*, 514 U.S. at 435).

In determining a *Brady* violation, materiality is evaluated by viewing the evidence

collectively. *Kyles*, 514 U.S. at 436. "We evaluate the tendency and force of the undisclosed

evidence item by item; there is no other way. We evaluate its cumulative effect for purposes of materiality separately ...." *Id.* at 437 n. 10. *See also Miller v. Dretke*, 431 F.3d 231 (5th Cir. 2005).

The second-degree murder statute under which Robinson was convicted, has two elements: (1) that the defendant killed a human being, and (2) that the defendant had specific intent to kill or inflict great bodily harm. LA. R.S. 14:30.1. Because the indictment was issued under a theory of complicity, the jury must have found that Robinson (1) aided or abetted in the killing and (2) had specific intent to kill. Had the jury found that the prosecution had not proved both elements' fulfilment beyond a reasonable doubt, they could not have returned a guilty verdict.

Thus, the Court must evaluate each item of withheld evidence separately on the basis of its strength in undermining confidence in the jury's finding of guilt. Then the Court must evaluate the collective body of alleged *Brady* evidence under the same standard.

> i.      **Statements in Supplemental Report That Corroborate Robinson's Statement**

The supplemental police report contains information from two independent sources that corroborates Julian Robinson's account of the crime. The report says that one anonymous man told one of the officers on the case the following:

> On March 23, 1997, Lewis contacted Deshawn Rose asking if he wanted to buy an AK-47 type rifle. Rose advised Lewis to meet him at South Claiborne Avenue and Martin Luther King Boulevard at 10:30 p.m. and he will pick him up there...On the night of the murder,

> Lewis met two subjects in a white station wagon[,] possibly a Ford, at the intersection of South Claiborne avenue and Martin Luther King Boulevard. Lewis directed the two subjects to the 1200 block of South Galvez Street where the victim retrieved the weapon from the bush that was located in the side courtyard of 1220 and 1222 South Galvez Street. The victim gave [the AK-47 that he was trying to sell] to one of the subjects and the second subject shot Lewis with a .45 caliber handgun then fled the area in the white Ford station wagon. The male subject further advised Detective Buras that the two subjects frequent the 2800 block of Dumaine St.[60]

The report also contained information about a woman who contacted Dionne Lewis, the victim's sister, with information about the murder:

> On Tuesday, March 25, 1997, [a]bout 7:30 p.m., Detective Buras was contacted via telephone by the victim's sister Ms. Dionne M. Lewis who stated, she was at her brother's residence located at 3345 Dumaine Street, when she was approached by a female who's (sic) name is unknown who stated to her, "she is sorry that her brother was killed and that she wanted to speak to her in private because she had information on the persons who killed her brother."

> At 7:00 pm, the female met with Ms. Lewis in the 3300 block of Dumaine Street and stated that Deshawn and Antione (sic) killed her brother[,] and they were driving a white station wagon. She further stated, the owner of the white station wagon is a white male who rents his car out for rock cocaine. Ms. Lewis advised Buras that she was going to find out what the female's name is and attempt to obtain further information on Deshawn and Antoine and the owner of the vehicle...

> ....

> On March 28, 1997, about 7:45 p.m., Detective Buras met with Ms. Dionne Lewis in [an] attempt to learn the identity of the female who stated that Antionne Oquinn (sic) and Deshawn Rose were the perpetrators in her brothers (sic) murder. Ms. Lewis advised Detective Buras that she has not seen nor heard from the female since that day and she does not know how to get in touch with her.[61]

---

[60]    St. Rec. Vol. 1 of 4 at 155.

[61]    *Id.* at 157.

Both of these accounts are largely consistent with both the statement Robinson gave to police and the account he offered Ms. Lewis days after the murder.

Robinson now contends that had he known that others had expressed knowledge of the details of the crime, especially accounts that tend to corroborate his statement's version of the events, his counsel would have investigated the matter further and been able to provide a better defense.[62]

Knowledge of this information could have affected trial proceedings in at least three ways:

    (1)    Defense, knowing that two people from the community had come forward with corroborating information, could have sought out witnesses with firsthand knowledge of the crime to testify at trial in a way that corroborated Robinson's statement to police.

    (2)    Defense, knowing the same, could have elicited from Det. Buras during cross-examination the fact that police, during their investigation, learned of information that fundamentally contradicted Janice Knight's testimony.[63]

    (3)    Defense, knowing the same, may not have filed motions to suppress Ms. Lewis's testimony in hopes of eliciting from her the fact that she had conversations with her neighbors about, and informed police of, information that fundamentally contradicted Janice Knight's testimony.[64]

The Fifth Circuit, in *Williams v. Whitley*, said, "Where the evidence would seriously

---

[62]    Objection at 4.

[63]    *State v. Coleman*, App. 2 Cir. 2000, 756 So.2d 1218, 32, 906 (La.App.2 Cir. 4/5/00), rehearing denied (deputy's testimony that investigation revealed three alibi witnesses was not hearsay, as deputy was merely testifying as to the results of his investigation).

[64]    *State v. Mason*, App. 1 Cir.1984, 447 So.2d 1134 (evidence is nonhearsay when offered nonassertively to prove that utterance occurred or that a conversation had taken place, not to prove the truth of the matter asserted).

undermine the testimony of a key witness on an essential issue or there is no strong corroboration [of that testimony], the withheld evidence has been found to be material." *Williams*, 940 F.2d 132. The jury's finding of guilt rested squarely upon Janice Knight's testimony at trial. This testimony was uncorroborated and was internally inconsistent on many issues over the course of the investigation: (1) whether she was on her way to a friend's house or a convenience store,[65] (2) whether the subjects' guns were in their hands or tucked into their pants,[66] (3) whether Deshawn Rose or Julian Robinson held the AK-47,[67] (4) whether she had seen or was familiar with any of the subjects prior to the crime,[68] (5) onto which street she exited after walking through the courtyard,[69] and (6) her knowledge of the distance she walked and the time elapsed between seeing the subjects and hearing the gunshots (to which she acknowledged at trial, "At the time I made that statement, I was very confused, you know?").[70]

The lack of corroboration of Ms. Knight's testimony and the inconsistencies within her story over time leave that testimony vulnerable to challenges of its accuracy – especially in light of the withheld evidence.

---

[65]     Tr. of Trial at 49.

[66]     *Id.* at 50-51.

[67]     *Id.* at 44; St. Rec, Vol. 2 of 4 at 202.

[68]     Tr. of Trial at 43.

[69]     *Id.* at 52.

[70]     *Id.* at 53.

**ii.      Statements in Police Report About Alleged Burglary**

The supplemental police report contains information from Dionne Lewis and an unnamed

man that the victim may have been thought to have burglarized Deshawn Rose's home. It states:

> [Ms. Lewis] further stated that on March 20, 1997, [at] about 7:00
> p.m., her brother Charles contacted her and stated he was confronted
> by a male on Saint Ann Street, who stated to him, "why did you rob
> my house[?]" Charles told her he walked away from the male who's
> (sic) name is unknown and he asked his sister to call him a cab...
> ....
> Lewis noted that her brother stayed with his girlfriend Shantrell
> Knox, at her residence located at 1262 South Johnson Street for the
> past three days, just before he was killed.[71]
>
> Detective Rousell advised Buras that a male who does not wish to
> give his name due to fear of retaliation heard on the street why the
> victim Lewis was killed. The male stated to Detective Buras that the
> victim of the homicide Charles Lewis on Thursday, March 20, 1997,
> broke into the home of one.. Deshawn Rose located at 3205 Dumaine
> Street and stole money from the residence. The victim Lewis did not
> know that Deshawn Rose knew that Lewis broke into the residence.
> On March 23, 1997, Lewis contacted Deshawn Rose asking if he
> wanted to buy a[n] AK-47 type rifle.[72]

Robinson contends that this withheld information is exculpatory because, if introduced, it

probably would have cast Ms. Knight's testimony as inaccurate and undermined the

prosecution's theory of Robinson's specific intent to kill or harm Charles Lewis.

One significant part of Ms. Knight's statements and testimony was her assertion that

Julian Robinson interrogated the victim seconds before the murder took place. When she first

talked to police on April 4, 1997, she said only that she heard the victim say, "I did not take it, I

---

[71]      St. Rec. Vol. 1 of 4, p. 155.

[72]      *Id.*

did not take it."[73] In her April 5th statement to police, she said: "As I was passing them I hear the guys talking to the fifth guy. I heard them tell him, 'Man, you took my shit.' I heard the fifth guy tell them, 'Man, I didn't take you (sic) shit.' Then they guys said "bitch you're a fucking liar."[74] Later in that statement, she identified Robinson as the speaker, only after being asked by police if she recognized any of the voices she heard. She said: "Yes, Julian's voice. He was the one who said, 'Man you took my shit.' Besides when Julian was talking he looked at me and I looked at him. I also saw the guy they were standing around talk back to Julian."[75]

    At trial she testified: "They was talking to him. One was talking to him."[76]

    She then said: "When I got to the circle, I heard Julius ask the guy, 'Where's my shit?'... He said, 'Man, I don't have your shit.'" She then said that Julius said, "Man, you got my shit."[77]

    Had evidence that Charles Lewis allegedly burglarized Deshawn Rose's home been presented at trial, defense counsel could have argued that Ms. Knight attributed the above statements to the wrong person. The implications of this are very strong. Firstly, it would undermine the prosecution's argument for both elements of the crime– specific intent and aiding the murder. In closing arguments, the prosecuting attorney asked the jury: "What kind of hit are we talking about here? Don't know. Don't care. Could be drugs. Could be guns. Could be anything. It doesn't matter to the case. All we know is that the Robinson was looking for his shit

---

from the victim and had him surrounded with his boys."[78] The attorney further stated: "[F]or him to be guilty, he doesn't have to be the trigger man. All he has to do is be a part of the execution of Charles Lewis. And he did play his part. When Janice Knight was walking by, nobody else was talking. It was him that was demanding all the stuff from Charles Lewis. He played his part in this murder."[79] The attribution of the interrogative quotes to Robinson was the cornerstone of State's theories of intent and complicity in the case.

Secondly, it may have served as the quietus of Janice Knight's credibility. If the jury were to doubt that Julian Robinson interrogated the victim, after Ms. Knight's many assertions that it was him and despite her saying she had known him for twelve years and easily recognized him,[80] the jury would have little reason to believe anything else she had attributed to him– from his holding the AK-47 (which, at one point, she attributed to Rose) to his very presence at the crime scene.

There is little doubt as to the importance to Robinson of knowing that Charles Lewis possibly burglarized Deshawn Rose's home. Had the Supplemental Report been provided to Williams prior to trial, it would have been the basis upon which she would have prepared Robinson's defense. Williams testified at the evidentiary hearing before the Court that had she known of this burglary she would have been able to explain why Robinson was present at the scene and negate an inference of specific intent by offering that Rose had a specific motive for killing Lewis. Robinson's theory of the case presumably would have been that the AK-47 for

---

[78]     Tr. of Trial at 64.

[79]     *Id.* at 67.

[80]     *Id.* at 45.

drugs transaction was a setup by Rose who was seeking retribution for the burglary of his house by Lewis.

Williams also testified that it would have been likely that she would obtain a witness who would be able to account for the burglary. Specifically, she stated, "I lived in the area and I knew a lot of the people around the area and I mean, I know things now since I've gotten better information that I didn't know at the time. I know Deshon Rose died about a year after he was acquitted."[81]

### iii.    Materiality of Alleged Brady Evidence Evaluated Collectively

Evaluating both the evidence corroborating Robinson's version of the facts coupled with the information regarding the burglary of Rose's home put this case in such a different light that the Court finds the confidence in the jury's verdict is substantially shaken. Also, considering the Fifth Circuit opinion in *Sellers*, the Court further finds that the failure of the prosecution to provide Robinson with the Supplemental Report prior to trial wholly undermines the Robison's ability to prepare a defense. The Supplemental Report - specifically the information regarding the burglary of Rose – would have provided Robinson with his defense.[82]

It is apparent that the jury convicted Robinson on Knight's testimony. While Robinson's attorney had ample opportunity to exploit the inconsistencies in Knight's statements, she did not offer evidence corroborating Robinson's version of the facts and did not offer a specific motive

---

[81]    July 30, 2007, Evidentiary Hearing Tr. at 55.

[82]    The Court finds that information regarding the burglary of Rose would not have been discovered even with reasonable diligence.

for Rose to kill Lewis. The Court finds that Robinson was virtually precluded from doing so because the prosecution did not provide Robinson with the Supplemental Report prior to trial. Thus, the Court finds that Robinson has successfully raised a *Brady* claim, and is entitled to a new trial. Accordingly,

**IT IS ORDERED** that Petitioner Julian Robinson's application for habeas relief should be and is hereby **GRANTED** on Petitioner's *Brady* claim.

**IT IS FURTHER ORDERED** that Petitioner's conviction for Second Degree Murder of Charles Lewis is hereby **VACATED**.

**IT IS FURTHER ORDERED** that the writ of habeas corpus will issue unless the State of Louisiana initiates retrial of the Petitioner within 180 days after entry of this order.

New Orleans, Louisiana, on this  31st  day of August, 2007.

_____
        **STANWOOD R. DUVAL, JR.**
**UNITED STATES DISTRICT COURT JUDGE**

**EXHIBIT ONE**

On March 31, 1997, Detective Buras, received a telephone call
from Ms. Dionne M. Lewis, who stated on Saturday March 29,
1997, a male subject by the name of Julious last name unknown
came to her at her residence located at 1220 South Galvez
Street, and stated to her that he was sorry that her brother
had been killed.

Julious stated on the day of the murder he and the victim met
in the 1200 block of South Galvez Street where the victim
told Julious to stay here because the AK-47 rifle is in the
bushes and he had to go meet two guys that are going to buy
the rifle.

The victim returned with the two guys in a white vehicle.
While the victim and the two guys were looking at the rifle
the victim asked Julious to leave as he was making the two
guys nervous. Julious at that time walked to the driveway
where he watched the transaction, when one of the subjects
pulled a weapon and shot the victim several times and then
fled in the white car. Ms. Lewis advised Detective Buras,
that she is going to try to obtain the last name of Julious
and his current address.

Ms. Lewis further advised Detective Buras, that on Saturday,
March 29, 1997, she observed the white station wagon parked
in the 2900 block of Freret Street, and the license plate has
been removed.

The four paragraphs above are taken from the Supplemental Report. The first three

paragraphs were excerpted from the Supplemental Report and provided to defense counsel.

Notably, the fourth paragraph indicates that Lewis herself was familiar with the white station

wagon, while the third paragraph only relays a story told by Robinson to Lewis. This is

significant because Lewis could have been a corroborating witness for Robinson.